Hope Natural Gas Company, *A Corporation*

*v.*

West Virginia Turnpike Commission

(CC 842)

Submitted September 10, 1958. Decided November 18, 1958.

914

*Charles E. Anderson, Hardin R. Harmer, Harold M. Garrett, Thomas A. White,* for plaintiff.

*Jackson, Kelly, Holt & O'Farrell, W. T. O'Farrell,* for defendant.

*W. W. Barron,* Attorney General, *Virginia Mae Brown,* Assistant Attorney General, amici curiae on behalf of West Virginia Turnpike Commission.

*Vincent V. Chaney,* amicus curiae on behalf of S. J. Groves & Sons Co.

DUCKER, JUDGE:

The Hope Natural Gas Company, a corporation, plaintiff, brought this action of trespass on the case, against the defendant, West Virginia Turnpike Commission, a commission created by and under the laws of the State of West Virginia, in the Circuit Court of Kanawha County, alleging damages in the sum of $35,000 resulting from the defendant's negligence in so constructing its turnpike at the point of a pipe line relocation easement as to cause slips and slides from the turnpike which destroyed plaintiff's pipe line. The defendant demurred to the plaintiff's declaration, and the circuit court sustained the demurrer and certified the questions raised thereon to this Court.

The facts as alleged by plaintiff, and which, upon demurrer are considered as true, are briefly: that, as a natural gas public utility corporation, it is, and has been, engaged in the business of producing, purchasing, storing and transporting natural gas and of distributing and marketing the same to domestic, commercial and industrial consumers and other purchasers thereof in West Virginia, and that in said business it operates a pipe line partly sixteen and partly twelve inches in diameter known as its Line H-164, which is more than 3500 feet in length extending from a junction point near the town of Glasgow, Kanawha County, to the plaintiff's Stonewall Jackson Compressor Station near Chelyan in said county, and that said pipe line transports natural gas in quantities in excess of one and one-half billion cubic feet annually, on, over and through a tract containing approximately 307 acres now and formerly owned by Shonk Land Company which company granted duly recorded easement rights to plaintiff in 1925; that the defendant initiated a plan for the construction of its turnpike from Charleston to Princeton, West Virginia, and obtained from plaintiff in June 1953 the right of immediate entry upon the lands and easements of plaintiff for which defendant agreed to pay compensation to plaintiff for the rights taken and further to grant plaintiff rights of way for the plaintiff to relocate its said pipe line, and under separate utility agreements defendant agreed to reimburse plaintiff for the reasonable and necessary actual cost of removal, relocation and reconstruction of said pipe line, all in accordance with plans of relocation agreed upon between the parties, and that said pipe line relocation was in due course accomplished to the satisfaction and approval of defendant and that plaintiff was reimbursed by defendant for such removal and relocation costs; that near Glasgow plaintiff's said Line H-164 lies at the foot of a steep mountain, and after crossing the Chesapeake and Ohio Railway Company's tracks, continues over and across the Shonk tract of land up the mountainside in a general northwesterly direc-

tion and the turnpike traverses the Shonk tract in a general northerly direction crossing Line H-164 at approximately right angles and about one-fourth of the distance up the mountainside from Cabin Creek at the foot of the mountain; that the entire mountainside is steep and precipitous and that defendant was compelled to and did make excavation into the mountainside for the purpose of providing a roadbed for the turnpike, and that in doing so defendant removed large quantities of rock and earth which it deposited on the mountainside below and adjacent to the roadbed of the turnpike with the turnpike being constructed upon a bench so made by such removal and deposit; that the defendant knew that if large quantities of rock and earth were cut from the mountainside and deposited in a fill below the roadbed such earth and rock, if not properly buttressed and supported, would break away if reasonable care were not used to prevent it, and that because of the negligence of the defendant in so constructing its turnpike large quantities of earth and rock so deposited by defendant did break away under and below the paved portion of the turnpike on the downhill side thereof and such rock, earth and fill slipped and slid down upon, underneath, along and over plaintiff's pipeline H-164, covering said line fifteen to twenty feet at some points, breaking it and rendering it unfit and entirely useless for its purpose and necessitating the acquisition of additional rights of way for a relocation of and construction of a new line to serve the purpose of the line so destroyed; and that defendant is liable to plaintiff for all its damages so suffered.

The defendant's demurrer specifies four grounds, namely: "1. Defendant is an agency of the State of West Virginia. 2. The construction, repair, maintenance and upkeep of the West Virginia Turnpike constituted an essential governmental function. 3. This action is in truth and effect an action against the State of West Virginia and as such is inhibited by the Constitution of the

State of West Virginia. 4. The defendant as an agency of the State of West Virginia is immune from suit."

The Certificate of the Circuit Court sustaining the demurrer sets out in practically the same language as the demurrer certified for decision by this Court four points which are collectively contained in the decision therein holding that an action in tort seeking to recover unliquidated damages is not maintainable against the Turnpike Commission, the effect of which is to hold that the West Virginia Turnpike Commission is entitled to immunity from such suit in tort actions, either under Article VI, Section 35 of the Constitution of West Virginia or otherwise under the law as an agent of the state exercising, under sovereign power, a governmental function. Although various phases of the principles involved have been heretofore decided by this Court, the facts in such cases being in varying degrees different from those here, this case is one of somewhat novel impression for this Court.

The Plaintiff's declaration states a good cause of action unless the Turnpike Commission is immune as claimed by defendant in its demurrer. The applicable provisions of the constitution and statutes are so vital to the issue that it is well to set them out here so as to show the basis for the contentions of the parties.

Section 35, Article VI of the Constitution of West Virginia, omitting the part thereof which clearly has no applicability here, is as follows:

"The State of West Virginia shall never be made defendant in any court of law or equity * * *".

The West Virginia Turnpike Commission was created by the Acts of the Legislature of West Virginia, 1947, Chapter 139, [Michie's Code, §1659 (1) et seq.] and amendments to said original Act were made by Chapters 154, 155 and 156 of the Acts of the Legislature of West Virginia, 1955. The portions of the provisions of the

twenty sections of those statutes, as amended, so far as the same are pertinent to the argument and inquiry here, and, omitting such parts of context as we think are unnecessary, are as follows:

"Section 1. *Constructing and Financing Turnpike Projects.*—* * * the West Virginia turnpike commission (hereinafter created) is hereby authorized and empowered to construct, maintain, repair and operate turnpike projects (as hereinafter defined) at such locations as shall be approved by the state road commission, and to issue turnpike revenue bonds of the state of West Virginia, payable solely from revenues, to pay the cost of such projects.

"Sec. 2. *Credit of State Not Pledged.*—Turnpike revenue bonds issued under the provisions of this act shall not be deemed to constitute a debt of the state or of any political subdivision thereof or a pledge of the faith and credit of the state or of any such political subdivision, but such bonds shall be payable solely from the funds herein provided therefor from revenues. All such turnpike revenue bonds shall contain on the face thereof a statement to the effect that neither the state nor any political subdivision thereof shall be obligated to pay the same * * *.

"Sec. 3. *West Virginia Turnpike Commission.*—There is hereby created a commission to be known as the 'West Virginia Turnpike Commission', and by that name the commission may sue and be sued, and plead and be impleaded. The commission is hereby constituted an agency of the state, and the exercise by the commission of the powers conferred by this act in the construction, operation and maintenance of turnpike projects shall be deemed and held to be an essential governmental function of the state.

"The West Virginia turnpike commission shall consist of five members, including the state road commissioner, who shall be a member exofficio, and four members appointed by the governor, by and with the advice and consent of the senate. * * *

"The members of the commission shall not be entitled to compensation for their services but each member shall be reimbursed for his actual expenses necessarily incurred in the performance of his duties. All expenses incurred in carrying out the provisions of this act shall be payable solely from funds provided under the authority of this act, and no liability or obligation shall be incurred by the commission hereunder beyond the extent to which moneys shall have been provided under the authority of this act.

\* \* \* \*

"Sec. 5. *General Grant of Powers.*—

\* \* \* (g) To fix and revise from time to time tolls for transit over each turnpike \* \* \*;

"(h) To acquire, hold and dispose of real and personal property in the exercise of its powers and the performance of its duties under this act;

"(i) To acquire in the name of the state by purchase or otherwise, on such terms and conditions and in such manner as it may deem proper, or by the exercise of the right of condemnation in the manner hereinafter provided, such public or private lands, including public parks, playgrounds or reservations, or parts thereof or rights therein, rights-of-way, property, rights, easements and interests, as it may deem necessary for carrying out the provisions of this act: *Provided, however,* That no compensation shall be paid for public lands, playgrounds, parks, parkways or reservations so taken, and that all public property damaged in carrying out the powers granted by this act, shall be restored or repaired and placed in its original condition as nearly as practicable; \* \* \*

"Sec. 6. *Incidental Powers.*—

\* \* \* \*

"If the commission shall find it necessary to change the location of any portion of any public road or state highway, it shall cause the same to be reconstructed at such location as the commission shall deem most favorable and of substantially the same type and in as good condition as the original road or highway. The cost of such reconstruction and any damage incurred in changing the location of any such road or high-

way shall be ascertained and paid by the commission as a part of the cost of such turnpike project.

\* \* \* \*

"Sec. 9. *Turnpike Revenue Bonds.*—The commission is hereby authorized to provide by resolution, at one time or from time to time, for the issuance of turnpike revenue bonds of the state for the purpose of paying all or any part of the cost of any one or more turnpike projects. The principal of and the interest on such bonds shall be payable solely from the funds herein provided for such payment. \* \* \*

"Sec. 10. *Trust Agreement.*—In the discretion of the commission any bonds issued under the provisions of this act may be secured by a trust agreement by and between the commission and a corporate trustee, which may be any trust company or bank having the powers of a trust company within or without the state. Any such trust agreement may pledge or assign the tolls and other revenues to be received, but shall not convey or mortgage any turnpike project or any part thereof. \* \* \*

"Sec. 11. *Revenues.*—The commission is hereby authorized to fix, revise, charge and collect tolls \* \* \*. Such tolls shall not be subject to supervision or regulation by any other commission, board, bureau or agency of the state. \* \* \*

\* \* \* \*

"Sec. 14. *Exemption from Taxation.*—\* \* \* the commission shall not be required to pay any taxes or assessments upon any turnpike project or any property acquired or used by the commission under the provisions of this act or upon the income therefrom, \* \* \*.

"Sec. 15. *Miscellaneous.*—

\* \* \* \*

"All private property damaged or destroyed in carrying out the powers granted by this act shall be restored or repaired and placed in its original condition as nearly as practicable or adequate compensation made therefor out of funds provided under the authority of this act.

"All counties, cities, villages, townships and other political subdivisions and all public agencies and commissions of the state of West Virginia, notwithstanding any contrary provision of law, are hereby authorized and empowered to lease, lend, grant or convey to the commission at its request upon such terms and conditions as the proper authorities of such counties, cities, villages, townships, other political subdivisions or public agencies and commissons of the state may deem reasonable and fair and without the necessity for any advertisement, order of court or other action or formality, other than the regular and formal action of the authorities concerned, any real property which may be necessary or convenient to the effectuation of the authorized purposes of the commission, including public roads and other real property already devoted to public use.

"Sec. 16. *Cessation of Tolls.*—When all bonds issued under the provisions of this act * * * such project or projects, if then in good condition and repair to the satisfaction of the state road commission, shall become part of the state road system and shall thereafter be maintained by the state road commission free of tolls: * * *

"Sec. 17-a. *Turnpike Part of State Road System; Pledge of Limited Funds by State Road Commission in Case of Deficit.*—* * * Any other provisions of this article to the contrary notwithstanding, in order to encourage the development of the state road system, the state road commission is authorized in its discretion to pledge by resolution and agreement annually to pay from the state road fund, subject to all prior commitments of such fund which shall be stated in the resolution and agreement, the amount of any yearly deficit between the principal and interest requirements of any turnpike project or portion thereof hereafter constructed * * *

\* \* \* \* 

"Sec. 20. *Act Liberally Construed; Constitutional Construction; Inconsistent Acts Repealed.*—This act, being necessary for the welfare of the state and its inhabitants, shall be liberally construed to effect the purposes thereof."

To sustain its claim of defendant's liability, the plaintiff lays special emphasis upon the following words or provisions in the statute, namely: (1) that in Section 3 the Commission is created and authorized to sue and be sued, plead and be impleaded, and is empowered to construct, maintain, repair and operate turnpike projects to facilitate vehicular traffic in the state, and in Section 1 authorized "to issue turnpike revenue bonds of the state of West Virginia, payable solely from revenues, to pay the cost of such projects;" (2) that under Section 2 turnpike revenue bonds shall not be deemed to constitute a debt of the state or a pledge of the faith or credit of the state, but shall be payable solely from the funds therein provided therefor from revenues, and that the bonds shall show such fact on their face; (3) that under Section 5 the Commission from time to time shall fix the tolls and employ all necessary employees and agents and fix their compensation; (4) that under Section 9 the proceeds of the bonds shall be used solely for the payment of the cost of the turnpike and all tolls shall be so fixed and adjusted as to provide a fund sufficient with other revenues, if any, to pay the cost of maintenance and operation of the turnpike project and the principal and interest on such bonds, and all such moneys from bonds or tolls shall be deemed to be trust funds for such purposes; (5) that under Section 13 suits at law or in equity may be brought by any holder of bonds or a trustee in any trust agreement to protect and enforce any right under the laws of the state or granted thereunder in or under a trust agreement covering such bonds or the duty of the Commission to fix proper tolls; and (6) that Section 15 of the Act requires that all private property damaged or destroyed shall be restored or repaired and placed in its original condition as nearly as practicable or adequate compensation made therefor out of funds provided under the authority of the Act.

To sustain its claim of immunity defendant lays special emphasis upon the following words or provisions in the

statute creating the Turnpike Commission, namely: (1) that in Section 3 the Commission is constituted an agency of the state and the exercise by the Commission of the powers conferred shall be deemed and held to be an essential governmental function; (2) that under Section 14 of the Act the project and property of the Commission are exempt from taxation; (3) that under Section 3 the members of the Commission, except the State Road Commissioner, who is a member ex officio, are appointed by the Governor with the advice and consent of the Senate; (4) that the bonds issued by the Commission are described as "bonds of the State of West Virginia"; (5) that under Section 5 the property acquired by the Commission is to be acquired in the name of the state, and that no compensation is to be paid for public lands taken by the Commission; (6) that under Section 6 the Commission is given authority to construct grade separations at intersections with public roads and to change lines and grades of such roads, that upon request of the Commission the State Road Commission shall relocate or discontinue any road or highway, and that the State consents to the use of all lands owned by it which the Commission deems necessary for the construction or operation of any turnpike project; (7) that under Section 7 the Commission is authorized to acquire property by purchase and to take title thereto in the name of the state; (8) that under Section 9 the Commission may sell such bonds for such price "as it may determine to be for the best interests of the state"; (9) that under Section 15 all counties, cities and other political subdivisions are empowered to lease, lend, grant and convey to the Commission any real property, including public roads, already devoted to public use; (10) that under Section 17 the State Road Commission is authorized to spend moneys for the study of any turnpike project and to use its engineers for such purpose and to pay for additional expert advice; and (11) that under Section 17-a when a turnpike project has been paid for, if such project is then in good condition and repair to the satis-

faction of the State Road Commission, such project shall then become part of the State Road system.

In addition to the recital of or reference to the foregoing provisions of the statute, counsel, in their respective briefs, have cited and given their interpretations of the holdings in practically all of the decisions of this Court pertaining in some degree or another to this subject, but we do not deem it necessary in this opinion to resort to a lengthy review of the same. The facts upon which the principles of the law are applicable are always varying and distinguishing. The principles are the criteria. The learned Judge in the court below has ably discussed and interpreted many of the cases pertaining to the subject matter, and, although we are unable to agree with his conclusion, we respect his viewpoint most highly and concede the question may be quite debatable. Our decision is in the final analysis one of applicability of the controlling principle rather than one of analogy of this case to the facts of the cases in prior decisions.

The first ground of the demurrer is only that the defendant is an agency of the state. Such, in a limited sense, is true, but an agency may have sovereign powers and not necessarily have the sovereign's immunity. The state has created many agents for public purposes, which agents exercise either proprietary or governmental functions, or both of such functions. In most instances, wherever the function from which the claim arises is purely governmental there is immunity from suit, but wherever the function is purely proprietary, there is no immunity. Such is, as we know, the situation with respect to the acts of municipal corporations which are units or branches of or "agents" exercising police power and other sovereign powers of the state as delegated to them by the legislature. This Court has decided numerous cases in which it has determined the question of liability or immunity according to whether the entity was governmental or proprietary. *Hayes* v. *Cedar Grove*, 126 W. Va. 828, 30 S. E. 2d 726; *Shaffer* v. *Hospital*, 135 W. Va. 163, 62 S. E.

2d 795; *Van Gilder* v. *Morgantown,* 136 W. Va. 831, 68 S. E. 2d 746. But in cases where such entity or agent has been held entitled to immunity, there has been, almost without exception, involved a commission or entity which was dependent in a large degree, if not wholly, upon the revenues of the state for its establishment, maintenance and operation, and which dependency, though not always clearly specified in such cases as controlling, was nevertheless a most important factor therein in the determination of the applicability of the sovereign or constitutional immunity. Cases involving only the exercise of a proprietary function by a truly governmental agency or branch of the state government hold that such agency or branch is clearly without immunity. The real difficulty in the matter has been in determining whether a commission or other *quasi* public body created by the legislature is in fact an agent of the state exercising sovereign powers delegated to it. Even without the constitutional inhibition against making the state a defendant in any suit, there is no right to sue a state upon a claim arising from the exercise of its governmental functions unless by consent of the state. In states without a constitutional restriction, the legislature may be free to waive the state's sovereign immunity, but in West Virginia the constitutional provision cannot be disregarded and the state or its real agent functioning governmentally cannot be subjected to suit. *Ward* v. *County Court,* 141 W. Va. 730, 93 S. E. 2d 44.

The second ground of the demurrer is that the construction, repair, maintenance and upkeep of the West Virginia Turnpike constituted an essential governmental function. Defendant argues that the various provisions of the statute creating the Commission show that the things which the Commission does are governmental, that the building and maintenance of roads have always been considered such a purpose and that all the rights and powers hereinbefore enumerated as given to the Commission prove it to be an agent of the state exercising governmental functions. While it is true that

the legislature has specified that the Commission is an agency of the state and that the exercise by the Commission of the powers conferred upon it shall be deemed and held to be an essential governmental function, this declaration alone cannot make it so, if the factual realities are otherwise. *State ex rel. Adkins* v. *Sims*, 127 W. Va. 786, 34 S. E. 2d 585. Nor is it sufficient, we think, that simply because the function is governmental, the immunity rule is applicable. The constitutional provision does not limit the power of the state to delegate governmental functions to *quasi* public corporations which have no taxing power or dependency upon the state for their financial support or success. Yet such corporations are afforded no immunity from suit or liability. The nature of the function is controlling only when it is performed by what can be truly said to be the state itself, that is, such a branch or agency of the state as is dependent upon the state government for financial support for its existence. A municipal corporation is, of course, such an agency, and the nature of the function determines the question of liability, while a railroad company, even though performing a service which could be classified as governmental if performed by a state agency, has no immunity. A state has the right to exercise all its governmental functions and, in the interest of public welfare, various proprietary functions, but unless there is a constitutional requirement to be met, it is free to delegate either governmental or proprietary functions to either public or *quasi* public corporations. So then the second ground of the demurrer is not well taken unless the third ground is maintainable.

The third ground of demurrer is that this action is in truth and in effect an action against the State of West Virginia and is inhibited by the Constitution. The fourth ground is the consequential result of a conclusion that the third ground is true. This ground narrows the issue to the practical and legal question of the status of the West Virginia Turnpike Commission. Is it the State or the *alter ego* of the State? We do not think so.

The various phases and provisions of the statute creating and empowering the Commission, which we have hereinabove set forth as emphasized by the parties, are the most pertinent factors in the determination of the status of the Commission and the mere statement of them is argument and needs little repetition.

The contentions of defendant that the officers of the Commission are appointed by the Governor, that no compensation is to be paid to the state for public lands taken by the Commission, that public road intersections may be changed, that municipalities may lease, lend or grant property to the Commission and that the State Road Commission may spend moneys for the study of any turnpike project and use its engineers for such purpose are of much substance. On the other hand, the contentions of the plaintiff that the Commission is authorized to issue turnpike revenue bonds of the state, payable solely from revenues to pay the cost of the project, that such bonds shall not be deemed to constitute a debt of the State or a pledge of the faith and credit of the State but shall be payable solely from the funds provided therefor from revenues, and that all tolls shall be so fixed and adjusted by the Commission to provide sufficient funds to pay the bonds and the operation and maintenance of the turnpike, and that adequate compensation for private property damaged or destroyed or not restored to or placed in its original condition shall be made out of the funds provided for in the statute are also of much substance.

That the purpose of the creation of the Commission and its functions are public ones, and the donation of property for the purpose and the retention by the State of authority to name the members of the Commission do not destroy its status as a separate entity, nor do such incidents retain to the state its sovereignty in the matters delegated. Retention of title in the state to lands used is more of a protective feature to avoid the loss of the property than evidence of the retention of sovereignty or control of operation, as such retention of title will enable the state

to retake possession after the project shall have been completed. The benefits enuring to the state by the construction and operation of a turnpike would certainly seem to justify donations of property for a public use. It is well settled that money, which is property, may be appropriated or given for a public purpose. *State ex rel. Summers* v. *Sims,* 142 W. Va. 640, 97 S. E. 2d 295, and cases cited therein.

The provisions of the statute clearly show that the Commission is an entity or *quasi* public corporation with the power to sue and be sued, to hold and acquire property including the right to do so by the exercise of the power of eminent domain, and to compensate for damages to private property solely from the revenues derived from tolls or other income as fixed and determined by the Commission, without any liability on the State or any pledge of its faith and credit.

A review of the principal cases which have been cited by counsel discloses, in the main, only that when there has or has not been immunity afforded an agency of the state it was because such agency was or was not exercising a governmental function. *Ward* v. *County Court, supra,* and the many cases cited therein. In the case of *City of Charleston* v. *Southeastern Construction Company,* 134 W. Va. 666, 64 S. E. 2d 676, it was held that the State Office Building Commission is a state agency and immune from suit, and the fact that the Commission's purpose was to house state agencies which are supported by state funds affords a distinctive aspect of that case from this case, although that case is concededly a somewhat borderline decision.

In determining whether a commission or other body or entity created by the state is in truth and effect a part of the state, all of the features or characteristics must be considered and consequently each case must rest upon the provisions of the entity's own creation. A turnpike commission may well be an independent agency in one state and not in another. However, we are not without

authority on the subject. In Pennsylvania where the legislative act creating the Pennsylvania Turnpike Commission, which is almost in identical language as our statute and which was enacted in 1937, it was held in the case of *Ewalt* v. *Pennsylvania Turnpike Commission,* 382 Pa. St. Rep. 529, 115 Atl. 2d 729, that the Commission was not immune from suit for damages for a continuing trespass arising out of the Commission's construction, operation and maintenance of the turnpike. And it has likewise been held in Illinois in the case of *People* v. *Illinois State Toll Highway Commission,* 3 Ill. 2d 218, 120 N. E. 2d 35, and in Missouri, in the case of *State ex rel. Highway Commission* v. *Bates,* 317 Mo. 696, 296 S. W. 418, that the Commissions, parties in said suits, were not entitled to immunity because they were separate entities and not the sovereign state. Although there is a provision in the Constitution of Illinois similar to that in West Virginia, but no such provision in Missouri, the principle is, we think, the same, although in the Missouri case, the court did say that, in addition to its principal reason for so holding, the State had waived its immunity. In the opinion in the case of *People* v. *Illinois State Toll Highway Commission, supra,* the Court said:

> "The multiplicity of factors which the courts have considered in reaching a decision of this question makes it impracticable to extract a simple rule which will fit every situation. The factor entitled to most weight, in our opinion, is that under no circumstances can the general funds of the State be reached in order to satisfy an obligation of the commission. That factor, together with the largely independent control of the commission over the construction and maintenance of the proposed toll roads, permits it to be regarded as an independent entity so far as subjection to suit is concerned. The extent to which the commission would or would not be immune to actual liability in any particular action is of course not now before us. Our decision is simply that the constitution does not forbid it to be made a party defendant."

Although the early case of *Tompkins* v. *The Kanawha Board*, 19 W. Va. 257, is greatly relied upon by counsel for the plaintiff and strongly supports liability on the part of the defendant, the only case in this State involving the question of liability of and lack of immunity in the West Virginia Turnpike Commission is that of *Guaranty Trust Co.* v. *West Virginia Turnpike Commission*, 109 F. Supp. 286, decided by the District Court of the United States for the Southern District of West Virginia in 1952. In both the *Tompkins* case and the *Guaranty Trust Company* case immunity was denied, and we agree with the decisions therein.

It is not amiss to comment on Section 15 of the Act which specifically provides for compensation to be made for the damage to private property. Surely this means more than any mere declaration of governmental functioning, and also more than the possible remedy afforded by any hopeful later appropriation to pay a moral obligation, or the possibility of an enforced eminent domain proceeding in a proper case. This provision of this section, which in effect can be said to constitute waiver of immunity, substantiates the theory of the independence of the Commission, and by virtue of such provision, being for reasons herein stated not in contravention of Section 35, Article VI of the Constitution, the plaintiff is given a right of action against the Commission for the alleged damage and destruction of its property.

We conclude with the thought that morality is just as much to be practiced by the state in its creation and operation of any separate entity for special purposes, whether public or not, as the state demands and expects of its citizens, and the following quotation from the opinion of Judge Johnson in the case of *Tompkins* v. *The Kanawha Board, supra,* at pages 263 and 264, is appropriate:

"It seems to me the test is, was there a corporation created charged with a duty and with rights and franchises incident to corporations, among which is the right to sue, without which the cor-

poration would be without vitality, and the corresponding liability to be sued, without which it would be a legalized despot trespassing upon the rights of the citizens, who would be powerless to protect themselves. The State creates no such irresponsible entity. The Legislature never intended, that such corporations should be without legal liability, notwithstanding the State owns its property. * * * It would be against all our ideas of State government, if a corporation created by the State to carry on a work of improvement should not be liable like any other corporation for the damage it inflicted, notwithstanding the State might own the property of the corporation. Sovereignty does not reside in such a corporation. The State cannot delegate her sovereignty. There is no creature of the State above the law and irresponsible. If this were so, the corporation might deny to certain individuals all benefits to be conferred by the corporation, and yet it being sovereign or representing sovereignty it could not be sued."

For the reasons stated, we are of the opinion and so hold that the question, collective in form, certified to this Court, whether a plaintiff's action in tort seeking to recover unliquidated damages is maintainable against the defendant, is answered in the affirmative, and accordingly, the ruling of the Circuit Court of Kanawha County in sustaining defendant's demurrer to the plaintiff's declaration is reversed.

*Ruling reversed.*